# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

DAVONTAE ROSS,
TIMOTHY LUCAS,
STARMANIE JACKSON,
KUSHAWN MOORE, JR., a minor,
by his parent and next friend,
KUSHAWN MOORE, SR.,
ASIA DIXON,
KEITH WILSON, and
KATRINA GARDNER,

On behalf of themselves and all
others similarly situated,

Plaintiffs,

v.

Hon. CHIEF JUDGE OF
MICHIGAN'S 36TH DISTRICT
COURT, in his official capacity as Chief
Judge of Michigan's 36th District Court;
Magistrates of Michigan's 36th District
Court, in their official capacity as
Magistrates of Michigan's 36th District
Court; WAYNE COUNTY SHERIFF, in his
official capacity as Sheriff of Wayne
County, Michigan,

Defendants.

Case No. 2:19-cv-11076
Hon. Laurie J. Michelson
Hon. Mag. J. Elizabeth A. Stafford

_____/

## **FIRST AMENDED CLASS ACTION COMPLAINT**

# INTRODUCTORY STATEMENT[1]

1.    Poor people in Detroit are routinely jailed because they cannot afford bail.  Meanwhile, similarly situated individuals who can afford bail are routinely released.  This unnecessary, unconstitutional, and costly discrimination against indigent people accused of crimes in Detroit is the result of the 36th District Court's policy and practice of making no inquiry whatsoever into an arrestee's ability to pay before imposing bail requirements.  These impossible cash bail terms operate as de facto orders of pretrial detention, yet the 36th District Court sets them without any of the findings or procedures that the Constitution requires before a court is permitted to order a presumptively innocent person to be detained prior to trial.  The constitutional requirements include an express individualized finding on the record that detention is the only possible option to address the person's risk of flight or danger to others.  This finding must be made after a meaningful individualized inquiry into: (A) whether the arrestee in question poses an unmanageable flight risk or danger to the community if released before trial, and (B) whether non-financial release conditions could adequately address any such risks or dangers.

---

[1] Under the relation-back doctrine, allegations in this amended complaint use present tense to refer to facts that Plaintiffs allege were true at the time of filing.

2.      In the City of Detroit, bail is first set at an arrestee's arraignment. Magistrates preside at these arraignments.   They impose secured cash bail conditions[2] in the majority of cases, and it is their policy and practice not to inform the arrestee that her ability to pay is relevant to the bail determination, let alone to accept evidence or make findings relating to the arrestee's ability to pay.   When imposing bail conditions, the Magistrates usually simply refer, in boilerplate fashion, to the nature of the alleged offense and the arrestee's criminal history.

3.      Arrestees who can afford to pay bail are routinely released from custody upon payment.   Arrestees who are otherwise identical, but are too poor to purchase their release, remain in jail because of their indigency.   On any given night, hundreds of people arrested in Detroit remain in custody in Wayne County jails before trial—and the vast majority are there only because they cannot afford to purchase their release.   These individuals risk losing their jobs, homes, custody of their children, health care, and other life necessities as a result of this wealth-based detention.   Many plead guilty before trial simply to minimize these harms.

4.      The named Plaintiffs in this case have all been detained since their arrests and remain in jail because they cannot afford the bail set in their cases. They participated in summary arraignments in the 36th District Court that many of

---

[2] In this complaint, the term "secured cash bail conditions" means bail conditions that can be satisfied only by the arrestee paying money (or causing it to be paid by someone else) either directly to the government or to a bail bondsman who, in turn, provides a surety to the government.

them could barely understand at which magistrates did not ask them any questions about their income, expenses, or ability to pay before setting their bail amounts. None were provided with court-appointed attorneys, and all therefore appeared at their arraignment without counsel.  For each day they remain in jail, Plaintiffs risk losing their jobs, their homes, their health, and their ability to support and take care of their children and other loved ones, among other harms.

5.     On behalf of the many other arrestees subjected to the 36th District Court's unlawful and ongoing pre-trial detention scheme, Plaintiffs challenge the routine use of secured cash bail to disproportionately detain indigent individuals arrested in the City of Detroit, which occurs without a hearing at which an arrestee's ability to pay is considered and without the presence of a lawyer to represent the arrestee.  This wealth-based pretrial detention system violates the Equal Protection and Due Process Clauses of the United States Constitution, as well as the Sixth Amendment guarantee of the right to counsel, as courts around the country have held in analogous situations.

6.     By and through their attorneys and on behalf of themselves and all others similarly situated, Plaintiffs seek injunctive and declaratory relief on behalf of the class they seek to represent addressing the 36th District Court's policy and practice of imposing secured cash bail conditions without a hearing at which an arrestee's ability to pay is considered as required by the Fourteenth Amendment,

3

and without constitutionally required individualized findings that the arrestee is an unmanageable flight risk or an identifiable and articulable danger to the community and that such risks cannot be alleviated by alternate non-financial release conditions.  Plaintiffs also seek a permanent injunction on behalf of the class they seek to represent prohibiting the Wayne County Sheriff from holding new pre-trial detainees in jail unless constitutionally adequate bail hearings have occurred.  And Plaintiffs seek compensatory damages as individuals and on behalf of themselves only.

## JURISDICTION AND VENUE

7.     This is a civil rights action arising under 42 U.S.C. § 1983, 28 U.S.C. § 2201 *et seq*., and the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1343 (civil rights jurisdiction).

8.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391, because Wayne County, the 36th District Court, and the City of Detroit are all located within the district, and a substantial part (if not all) of the events giving rise to the Plaintiffs' claims occurred or will occur in this district.

## PARTIES

9.     Plaintiff Davontae Ross is a resident of the City of Detroit and Wayne County.  He brings this suit on behalf of himself as an individual and on behalf of a

class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme.  He cannot afford to pay the cash bail imposed in his case, and he cannot afford counsel.

10.    Plaintiff Timothy Lucas is a resident of the City of Detroit and Wayne County.  He brings this suit both on behalf of himself as an individual and on behalf of a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme.  He cannot afford to pay the cash bail imposed in his case, and he cannot afford counsel.

11.    Plaintiff Starmanie Jackson is a resident of the City of Detroit and Wayne County.  She brings this suit both on behalf of herself as an individual and on behalf of a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme.  She cannot afford to pay the cash bail imposed in her case, and she cannot afford counsel.

12.    Plaintiff Kushawn Moore, Jr., is a resident of the City of Detroit and Wayne County.  He brings this suit both on behalf of himself as an individual and on behalf of a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme.  He cannot afford to pay the cash bail imposed in his case, and he cannot afford counsel.  Mr. Moore is seventeen-and-one-half years old.  He brings this action through his father and next friend, Kushawn Moore, Sr.

5

13.     Plaintiff Asia Dixon is a resident of the City of Detroit and Wayne County.  She brings this suit both on behalf of herself as an individual and on behalf of a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme.  She cannot afford to pay the case bail imposed in her case, and she cannot afford counsel.

14.     Plaintiff Keith Wilson is a resident of the City of Detroit and Wayne County.  He brings this suit both on behalf of himself as an individual and on behalf of a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme.  He cannot afford to pay the cash bail imposed in his case, and he cannot afford counsel.

15.     Plaintiff Katrina Gardner is a resident of the City of Detroit and Wayne County.  She brings this suit both on behalf of herself as an individual and on behalf of a class of similarly situated people subjected to Defendants' wealth-based post-arrest detention scheme.  She cannot afford to pay the cash bail imposed in her case, and she cannot afford counsel.

16.     Defendant Benny N. Napoleon ("the Sheriff") is the elected Sheriff of Wayne County.  He is responsible for the operation and administration of all three jails in Wayne County where Detroit arrestees are held after arraignment by the 36th District Court.  He is sued by the Plaintiffs on behalf of the class they seek to represent for injunctive and declaratory relief in his official capacity as Sheriff of

Wayne County.  He is also sued for damages in his official capacity by the individual plaintiffs.

17.    Defendants Bari Blake Wood, Millicent D. Sherman, Laura A. Echartea, Dawn White, and Jeffrey Kleparek (collectively, "the Magistrate Defendants") are the five Magistrates employed at the 36th District Court. Defendant Wood is the Chief Magistrate, and has partial responsibility for administering the actions of the other magistrates and for reviewing their performance.    The Magistrate Defendants are responsible, *inter alia*, for conducting the arraignments at which bail is initially set for individuals who are subject to the 36th District Court's jurisdiction and who are detained at the time of their arraignment.  Their bail determinations set the conditions for detention in Wayne County jails pending the arrestees' next court appearance.  The next appearance is always scheduled for at least a week after arraignment, and as a result, indigent arrestees such as Plaintiffs have no viable way to have their bail conditions redetermined between arraignment and their first counseled hearing. The Magistrate Defendants are sued by the Plaintiffs on behalf of the class they seek to represent for injunctive and declaratory relief in their official administrative capacities for having developed and implemented the arraignment policies and practices described herein.  In the alternative, they are sued by the Plaintiffs on behalf of the class they seek to represent in their judicial capacity for declaratory

relief only. They are also sued for damages in their official capacity by the individual plaintiffs.

18.    Defendant Nancy M. Blount is the Chief Judge of the 36th District Court. She is responsible generally for the administration of the 36th District Court, including hiring, firing, and overseeing Magistrates on behalf of the 36th District Court. The Chief Judge has full authority and control over the court's administration, subject only to the control of the Michigan Supreme Court. She is sued for injunctive and declaratory relief by the Plaintiffs on behalf of the class they seek to represent in her official administrative capacity as the supervisory official with the authority to alter the policies and practices of the Magistrate Defendants at arraignments. In the alternative, she is sued by the Plaintiffs on behalf of the class they seek to represent in her judicial capacity for declaratory relief only. The Chief Judge is also sued for damages in their official capacity by the individual plaintiffs.

## FACTUAL ALLEGATIONS

### A.    The Named Plaintiffs Are Being Held in Jail Solely Because They Are Unable to Pay for Their Release.

19.    Plaintiff Davontae Ross is a 24-year-old Black man. He was arrested on April 11, 2019 outside of his apartment for failing to appear at a hearing in 2014 regarding a misdemeanor ticket he had received in 2014 for staying in a park after dark.

8

20.     Mr. Ross was taken to the Detroit Detention Center ("DDC") on April 11, 2019.  He was arraigned via videoconference the next morning.  He did not have an attorney at the arraignment, and he cannot afford to hire one.  His arraignment was conducted quickly.  The magistrate told him that his bail was $200 cash/surety.  The magistrate did not ask him if he could afford to pay that amount and did not provide him with any reason for why his bail was set at that amount.  The magistrate told Mr. Ross that he would have to stay in jail until his next court date—a full two weeks later—if he did not have $200 for his bail.  Mr. Ross cannot afford to pay his bail and he therefore remains in detention because of his five-year-old ticket.

21.     Plaintiff Timothy Lucas is a 65-year-old Black man who suffers from several serious health conditions, including epileptic seizures, hypertension, and asthma.   He has no source of income other than disability payments of approximately $800/month.  He was arrested on April 9, 2019, for assault and battery, a misdemeanor.  He has no prior criminal convictions.  He was taken to DDC.

22.     Mr. Lucas was arraigned via videoconference on April 12, 2019, approximately 72 hours after his arrest.  He did not have an attorney for the proceeding, and he cannot afford to hire one.  Speaking very quickly, the magistrate read the charge against him, explained the penalty he faced if convicted,

and set his bail at $3,500/10%.   The only question she asked Mr. Lucas was whether he understood what she said, and Mr. Lucas was not given an opportunity to ask questions of the court despite wishing to do so.  She did not ask Mr. Lucas any questions about his income, his expenses, or his ability to afford the bail amount set.  Nor did the magistrate provide any explanation as to why she set bail at that amount.  Mr. Lucas received no paperwork after the arraignment.

23.    Mr. Lucas cannot afford to pay the bail amount set in his case.  He therefore remains in detention, where he has not received his medication in a timely or sufficient manner, despite numerous requests.

24.    Plaintiff Starmanie Jackson is a 24-year-old single Black mother and sole caregiver of a five-year-old and a three-year-old.  She is a certified nursing assistant.  She was arrested on April 8, 2019 for a felony assault charge.  She was eventually taken to DDC.  While there, no one told her anything about the possibility of posting bail, and her family was unable to get in touch with her for two days.

25.    Ms. Jackson was arraigned for failing to appear for court appearances relating to traffic tickets via videoconference on April 9, 2019.  She did not have an attorney for the proceeding, and could not afford to hire one.  The magistrate told Ms. Jackson about the traffic tickets, that her bail was set at $200, and the date of her next court hearing.  The magistrate did not ask Ms. Jackson any questions

about her ability to afford the bail amount. Nor did the magistrate allow Ms. Jackson to ask any questions during her arraignment.

26.     The next day on April 10, 2019, Ms. Jackson was arraigned via videoconference by a different magistrate for the felony charge. She still did not have an attorney for the proceeding. The magistrate conducted the arraignment quickly, telling her the charges against her, that her bail amount was set at $500, and the date of her next court hearing. The magistrate did not ask her any questions about her ability to afford the bail amount, explain why it was set at $500, acknowledge that Ms. Jackson was already being held on a $200 bail that she could not afford, or allow Ms. Jackson to ask any questions.

27.     Ms. Jackson cannot afford to pay the $700 combined bail. She is the sole provider for her young children, and sometimes cannot even afford her normal monthly expenses. Since being arrested, she has missed the first day of her new job at a nursing home, which would have been her primary source of income. Ms. Jackson remains in detention, and has lost approximately 30 pounds in her five days of detention.

28.     Plaintiff Kushawn Moore, Jr., is 17-and-one-half-years-old Black youth. He has lived in Detroit his entire life, and is currently enrolled in eleventh grade at Ace Academy, a local high school. He has a 2.9 GPA, and expects to graduate in 2020. He was arrested on April 10, 2019 for armed robbery, a felony.

He has no prior criminal history. That same day at approximately 8:00 p.m., he arrived at DDC. He told officers that he was only 17 years old, but they did not believe him, called him names, and handcuffed him to a bench. No one told him what would occur next.

29. The next day, he was arraigned via videoconference. He did not have an attorney for the proceeding and could not afford one. The only question the magistrate asked him was his name. She did not ask him any questions about his ability to afford bail. She then proceeded to talk so quickly that he could not understand anything she said, except that his bail was set at $50,000, without a 10% option. The magistrate did not provide any explanation for why his bail was set at this amount. His entire arraignment lasted approximately one minute and thirty seconds.

30. Neither Mr. Moore nor his parents can afford to pay $50,000 bail. He therefore remains in detention.

31. Plaintiff Asia Dixon is a 20-year-old Black woman. She was arrested near her home on April 10, 2019 for assault with a dangerous weapon. She was taken to DDC.

32. On the third day of her incarceration, Ms. Dixon was told that she would see a magistrate. She was arraigned via videoconference later that day. The magistrate spoke so quickly that Ms. Dixon could barely understand what was

being said.  She was not allowed to ask any questions during her arraignment.  The only way she was able to determine that her bail was $10,000/10% was by asking a DDC guard afterwards.  The magistrate did not provide any reasons for why her bail was set at that amount.

33.    Ms. Dixon did not have an attorney representing her during the proceeding and she cannot afford to hire a private attorney.

34.    Ms. Dixon cannot afford to pay $1,000 and therefore remains in detention.  She has already missed the first day of a new job, and is likely to lose an additional job opportunity if she is not released by April 15.

35.    Plaintiff Keith Wilson is a 66-year-old Black man.  He was arrested on April 11, 2019 for assault with intent to do great bodily harm, a felony.  He was taken to DDC.

36.    On April 12, 2019, Mr. Wilson was taken to a large holding cell to wait to be arraigned.  Before it was his turn, the guard told him to stand behind a line on the floor and just listen to the magistrate.  Mr. Wilson was then arraigned via videoconference.  During the arraignment, the magistrate was talking fast and he could only understand some of what was being said.  He felt that he could not say anything at all during the proceeding.

37.    The magistrate told Mr. Wilson that his bail was $25,000/10% but did not ask him if he could afford that amount.  The magistrate did not ask him about

his income or his expenses.  She also did not provide him with any reasons for why she set the bail at that amount.

38.    Mr. Wilson did not have an attorney representing him during his arraignment and he cannot afford to hire a private attorney.

39.    Mr. Wilson cannot afford to pay his $25,000/10% bail and therefore remains in detention.

40.    Plaintiff Katrina Gardner is a 26-year-old Black woman.  She was arrested on April 10, 2019 for assault.  She was taken to DDC.

41.    Ms. Gardner was arraigned on April 12, 2019 via videoconference. She could not understand what the magistrate was saying.  The magistrate was speaking so quickly that all she heard was numbers.  Ms. Gardner asked the magistrate what her bail amount was and the magistrate told her that the guard would tell her.  The magistrate did not provide any reasons for the bail amount that was set.  The magistrate did not ask Ms. Gardner any questions about her income or expenses.

42.    After the videoconference ended Ms. Gardner asked the guard what her bail amount was and was told it was $630.

43.    There was no attorney representing Ms. Gardner during her arraignment and she cannot afford to hire a private attorney.

44.     Ms. Gardner cannot afford to pay her bail and she therefore remains in detention.

**B.     Defendants' Arraignment Policies and Practices Constitute a Wealth-Based Detention System That Keeps People in Jail for the Sole Reason that They Cannot Afford Bail.**

45.     The Magistrate Defendants routinely impose secured cash bail conditions on the arrestees who appear before them for arraignment without justification.  Secured cash bail conditions vary in amount and details, but all share the common trait of requiring the arrestee to pay money, either directly to the government or in the form of fees paid to a professional surety such as a bail bondsperson, to secure the arrestee's release from jail.  Typically, such conditions take one of two forms:  (1) a "10%" bail condition, which requires the arrestee to post at least 10% of the total bail amount in cash or real property as a security or else to have a surety, such as a professional bondsman, execute a bond for one-fourth of the total bail amount—a service for which most bondsmen charge 10% of the amount they have to guarantee; or (2) a full cash bail condition, which requires the arrestee to pay, or the professional surety to execute a bond for, the entire bail amount—a service for which most bondsman charge 10% of the full bail amount. Either option requires out-of-pocket financial expenditure by the arrestee, either in the form of money paid directly to the government or else money paid to a bondsman as a non-refundable fee.

46.     Yet, as detailed below, the policy and practice of the 36th District Court is that the Magistrate Defendants offer no opportunity for an arrestee's indigency to be considered at the arraignment.  As a result, indigent arrestees in Detroit are routinely detained after their arraignment without any consideration of whether they can afford to pay cash bail.  Instead, secured cash bail conditions are imposed without any individualized consideration of, or constitutionally required findings regarding, the person's interest in pre-trial liberty, whether the person poses an unmanageable risk of flight or identified and articulable danger to the community, and whether non-financial conditions could adequately protect against such risks.

     **i.  Prior to Arraignment, Indigent Arrestees Have No Way to Be Released from Detention.**

47.     The Detroit Police Department ("DPD") operates the DDC in partnership with the Michigan Department of Corrections ("MDOC").  The DDC serves as a consolidated lock-up facility for almost all detained pre-trial arrestees in the City of Detroit during the first 72 hours of detention.

48.     When a state district or circuit court judge issues an arrest warrant, the judge may, for most misdemeanors and city ordinance violations, provide for an interim secured cash bail of a specified amount.  If the judge specifies interim bail on the warrant, an arrestee can purchase their release prior to arraignment by paying the specified amount.  Because warrants are issued *ex parte*, an individual

against whom a warrant is issued has no chance to assert her indigency as a factor in the setting of interim bail.

49.     When a defendant is arrested *without* a warrant for allegedly committing a misdemeanor or violating a city ordinance that is punishable by not more than one year of imprisonment, the arrestee is transported to the DDC. There, she is detained until her arraignment unless she is offered and able to meet interim bail.   By statute, an interim bond for warrantless arrests under this procedure may be offered at the DDC for the minor offenses described above, but must be in the amount of *at least* 20% of the minimum possible fine that can be imposed upon conviction.   In implementing interim bond, DDC follows a bond schedule under which:   people accused of misdemeanors punishable by a maximum of 90 days of confinement cannot be released unless they pay a $100 bond; people accused of misdemeanors punishable by a maximum of 93 days of confinement cannot be released unless they pay a $250 bond; and people accused of drunk-driving related offenses cannot be released unless they pay a $500 bond.

50.     Arrestees charged with a felony or with a misdemeanor punishable by more than one year of imprisonment are ineligible by statute to be released on an interim bond and will typically remain detained at the DDC until their arraignment.

51.     Detainees who are not offered interim bond, who are unable to pay interim bond, or who are ineligible for interim bond remain detained at the DDC

until their arraignment.   Arraignments typically occur within approximately 48 hours of arrest on weekdays, but can take longer.

### ii. Arraignments Before Magistrates Are Not Hearings at Which Arrestees' Indigency Is Considered.

52.   The Magistrate Defendants preside over arraignments at the 36th District Court.   Arraignments are conducted every weekday in morning and afternoon sessions.   Morning sessions typically focus on traffic offenses and misdemeanors; afternoon sessions typically focus on felonies.   Magistrate Defendants preside over the arraignments based upon a revolving schedule that is determined administratively at the 36th District Court.   On a typical day, one Magistrate Defendant will preside over the morning docket, and another will preside over the afternoon docket.   Each docket will usually include a few dozen arrestees.

53.   The vast majority of arraignments are conducted by video teleconference between a 36th District courtroom in downtown Detroit and the DDC.[3]   Arrestees are gathered together in a room at the DDC by guards.   Before the arraignment or the video teleconference begins, DDC guards typically give

---

[3] A few arraignments may also be conducted by video teleconference with one of the Wayne County Jails or a DPD detention room.  A few arraignments are also conducted in person in situations where an individual has turned herself in at the courthouse on an outstanding warrant.  These arraignments are conducted in the same fashion in all material ways as the ones described in the remainder of this section.

instructions to the arrestees, off camera, about what will occur during the arraignment.  These instructions have included admonitions that the purpose of the arraignment is to enter a not guilty plea, that arrestees are not to explain their situation to the judge, and that they should not do anything other answer the judge's questions "yes" or "no."  Then the arraignments begin, with each arrestee stepping in front of a video camera when instructed to do so by a jail guard.  In the background behind the arrestee is a banner with the words "Detroit Detention Center" and the seal of Michigan.

54.    The arraignments are summary affairs.  A typical arrestee spends approximately two to four minutes on camera—the vast majority of which is spent having information read to her.  In that time, the Magistrate Defendants often speak so rapidly that it is difficult, even for legally-sophisticated arrestees, to understand what is being said or to fully grasp much of what is happening.  As required by Michigan Court Rule 6.104(E)(1), a Magistrate Defendant reads each of the charges against the arrestee and states the maximum possible jail sentence that could be imposed for each charge.  As required by Michigan Court Rule 6.104(E)(2), the Magistrate Defendant also reads the arrestee some of her rights, including the right to remain silent, the right to counsel, and the right to have a court-appointed attorney if she is unable to afford one.  However, absent extraordinary circumstances, no court appointed attorney is provided for arrestees

at the arraignment, and the overwhelming majority of arrestees appear at arraignment without counsel.

55.    During the typical arraignment, the Magistrate Defendant allows the arrestee to speak on only three occasions.  First, she is asked to state her name. Second, after the charges are read, the arrestee is asked if she understands them and the possible sentence.  Third, after the rapid-fire reading of rights, the arrestee is asked if she understands those rights.  If the arrestee states that she does not understand the charges or her rights, the Magistrate Defendant will often simply repeat the charges or rights again using the exact same language but speaking a bit slower and in a louder (and often more exasperated) tone.

56.    If the arrestee is charged with a new felony (or felonies), the Magistrate Defendant sets a date for the next two appearances in court: a probable cause conference followed by a preliminary examination.  By court rule, the probable cause conference must be set "not less than 7 days or more than 14 days after the date of the arraignment"; the preliminary examination must be scheduled "not less than 5 days or more than 7 days after the date of the probable cause conference."  In practice, the probable cause conference is typically set for a date eight to ten days after the arraignment, with the preliminary examination occurring five or six days later.

57.    If the arrestee is charged with a new misdemeanor (or misdemeanors), the Magistrate Defendant sometimes schedules only the first pre-trial hearing, but the same timeline applies: the first hearing is set for seven to fourteen days from the date of arraignment, and most often is scheduled eight to ten days after arraignment.

58.    The Magistrate Defendants then proceed to set secured cash bail conditions and other non-financial conditions that must be satisfied if the arrestee is to be released prior to the probable cause conference.

59.    The bail-setting phase of the arraignment typically lasts approximately 30 to 60 seconds.  The Magistrate Defendants do not advise the arrestee that she has the right to have her ability to pay considered as part of the bail determination. They do not ask the arrestee if she has financial resources to pay for her release. And they do not provide any opportunity for the arrestee to offer evidence or proffers of evidence regarding her ability or inability to pay secured cash bail conditions.

60.    The Magistrate Defendants also do not ask the arrestees any questions that might help to determine whether the individual poses an identifiable and articulable danger to the community or an unmanageable flight risk, other than by noting whether the arrestee has holds from another jurisdiction.  Neither do the Magistrate Defendants ask any questions about (or discuss) whether non-financial

conditions could suffice to assure the arrestee's attendance at hearings in her case. Nor do they inquire as to the details of why an arrestee who may have missed court hearings in other cases may have done so.

61.    In fact, arrestees are discouraged from responding or participating in any way during the bail-setting part of the arraignment, and they are not even asked any "yes/no" questions in the vast majority of cases.

62.    In announcing the secured cash bail considerations, the Magistrate Defendants do not refer to any individualized findings regarding the relationship between the arrestee's ability to pay and any possible risk of flight or danger to the community.  Instead, they simply repeat formulaic statements such as "based on the charges on their face and your prior criminal record, I set bail at $XXX."  In some cases, the Magistrate Defendants may also recite some of the alleged facts of the alleged crime or note that the arrestee has a "hold" from another jurisdiction. But even when these factors are noted, the specific evidence in support of the allegations or hold are not discussed or analyzed, nor is there any opportunity to challenge the allegations or their relevance to the court's bail determination.  In any event, ability or inability to pay is *never* invoked by the Magistrate Defendants as a consideration.

63.    In addition, the Magistrate Defendants often impose additional conditions, such as a prohibition on possessing a firearm while on release or a

prohibition on contacting an alleged victim. Typically, these conditions are imposed in the same manner as the secured cash bail conditions: without asking any questions of the arrestee, and based only on the nature of the alleged offense and the arrestee's criminal history.

64.     The process described above works slightly differently for arrestees who are not being charged with new felonies or misdemeanors, but who have instead been arrested because of a failure to appear at a hearing in another matter (almost always a minor misdemeanor such as driving without a license or insurance), or for failure to complete payment in a prior misdemeanor matter. In such cases, the district judge who presided at the missed hearing (or in which payment was not completed) will have already issued a bench warrant as a result of the arrestee's non-appearance and will have dictated the associated secured cash bail. Such bench warrants are generally issued automatically and do not take into account the individual's ability to pay.

65.     When arraigning arrestees under these circumstances, the Magistrate Defendants will advise the arrestee that the Magistrate has no authority at all to alter the secured cash bail conditions imposed by the district judge who issued the warrant. The result is the automatic imposition of secured cash bail conditions, sometimes amounting to thousands of dollars, without any opportunity for

reconsideration.  In such cases, the first hearing is sometimes set as much as a month after arraignment.

66.    For example, on March 5, 2019, an arrestee was arraigned for failing to pay a ticket for driving without a license and failing to appear for a review hearing on the same ticket.  When the arrestee indicated that he had missed the review hearing in question because he was detained in a county jail at the time, he was informed that the secured cash bond of $345 could not be changed and was given a review hearing on April 2, 2019, 28 days later.  Another arrestee arraigned on the same day claimed to have missed a prior hearing on a gambling and trespassing offense because the district judge's clerk had failed to reschedule the hearing despite agreeing to do so.  Magistrate Kleparek informed the arrestee that although the arrestee's story was credible, he had no power to reconsider the $1,000 cash/surety imposed by the district judge's warrant—even though the arrestee had voluntarily turned himself in to attempt to remedy the outstanding warrant.  That arrestee was given a pretrial hearing on March 12, 2019.

67.    Once the Magistrate Defendants have announced the bail conditions, they instruct the arrestee to step away from the camera.  If the arrestee seeks to ask a question, the Magistrate Defendants typically interrupt the arrestee with a warning that anything she says can and will be used against her in a court of law. In issuing such a warning, the Magistrate Defendants typically do not first inquire

whether the individual's question pertains to the underlying criminal allegations or to the court's bail determination. In one instance on March 18, 2019, Magistrate Sherman told an arrestee who attempted to raise a question that "now is not the time to ask questions." Sometimes, DDC guards can be heard over the video audibly "shushing" an arrestee or otherwise instructing them not to speak further with the Magistrate, even when the arrestee attempts to ask questions about their particular bail situation. Predictably, many individuals who are bold enough to interpose questions in the first place do not proceed with their questions after such an admonition.

68.    Because other arrestees are in the same room at the DDC while awaiting their own turn in front of the camera, all arrestees see what happens when another arrestee seeks to speak up at the arraignment.

69.    When an arrestee nonetheless persists in asking a question, the response is often to inform the arrestee that she should raise her question with her attorney. But indigent arrestees do not *have* attorneys at the time of the arraignment.

70.    In at least some instances, the Magistrate Defendants possess a report prepared by an employee from the 36th District Court's Pre-Trial Services Unit. The pre-trial services reports may recommend a cash bail condition of a particular amount, but these reports do not make findings about the arrestee's ability to pay,

and do not consider the ability to pay as a factor to be considered in recommending a bail amount.  Arrestees are not provided with a copy of the pre-trial services report at the arraignment and in many cases have no way to even know that the judge is referring to such a report at all.  In any event, the arrestee is typically not given any of the information (other than the nature of the charges and criminal history) that is contained in the report, and they are not given a chance to rebut any information in the report.

71.    After being told to step away from the camera, some arrestees can be heard over the video feed speaking with the guards or other arrestees.  Some arrestees have commented that they do not understand what just happened; some ask the DDC guards what the bail decision means for them; some even laugh or otherwise verbally indicate the impossibility of satisfying the secured cash bail conditions that have just been imposed, e.g., by stating that they will lose their jobs because of the amount of bail that was just imposed.  Although such reactions are plainly audible in the courtroom, they do not prompt the Magistrate Defendants to ask that the detainee return to the camera for further discussion.

72.    Thus, as a matter of policy and practice, the Magistrate Defendants make no attempt to determine an arrestee's financial situation, and they make no inquiry into or findings about each arrestee's ability to satisfy secured cash bail conditions.

73.     As a matter of policy and practice, Magistrate Defendants do not advise arrestees of their right to pretrial liberty or to have their ability to pay considered when setting bail conditions.   Similarly, as a matter of policy and practice, the Magistrate Defendants do not advise arrestees that they have a right to have non-financial bail conditions considered as a (preferred) alternative to secured cash conditions.   Thus, as a matter of policy and practice, arrestees are routinely prevented and discouraged from presenting arguments and evidence that would be vital to a proper and lawful bail determination.

74.     The results are troubling.   For example, during the week of April 1–5, attorney court watchers observed every arraignment conducted at the 36th District Court.   There were 252 arraignments of individuals who did not have attorneys. Not a single one of these individuals was asked whether they could afford to pay bail.   The court watchers were unable to determine the disposition in two arraignments, and two arraignments resulted in detention without bail.   Of the remaining 248, some form of cash bail was imposed in 212 cases—85.5% of the total.

75.     For years, these policies have consistently resulted in the lengthy, needless, and devastating jailing of indigent individuals.   Other arrestees with financial means were able to pay their predetermined money bail and secure their release.

27

76.     The remainder of this Complaint refers to the policies and practices of the 36th District Court, as described in this section, as the Court's "Arraignment Policies and Practices."

### iii. Most Arrestees Cannot Afford Lawyers, But Arrestees Who Can and Do Retain Private Counsel Receive More Favorable Treatment at Arraignment.

77.     As stated above, indigent arrestees at the time of arraignment have not yet been assigned court-appointed counsel, absent extraordinary circumstances such as obvious evidence of potential incompetence to stand trial.

78.     The 36th District Court does not publicly disclose the percentage of defendants who are ultimately assigned court-appointed counsel, but in 2008, the National Legal Aid & Defender Association estimated that 90% of criminal defendants in the 36th District Court qualified as indigent for purposes of state-appointed representation.[4]

79.     Detroit's poverty rate in 2017, defined as the percentage of the population living below the federally determined poverty line, was 34.5%.  The median household income for Detroit in 2017 was around $30,000, under half of the nation-wide median household income.  Accordingly, Detroit has an even

---

[4] *See* The National Legal Aid & Defender Association, *A Race to the Bottom, Speed & Savings Over Due Process: A Constitutional Crisis*, at p. 27 (June 2008)*, available at* http://www.mynlada.org/michigan/michigan_report.pdf.

28

greater share of individuals who are unable to afford either secured cash bail conditions or legal representation than most communities.

80.    The Federal Reserve recently reported that approximately 40% of adults in the United States are unable to pay a $400 emergency expense.[5]    The percentage of Detroiters unable to afford such expenses is almost certainly higher.

81.    The inability to afford secured cash bail conditions falls disproportionately on communities of color.[6]

82.    For detainees who pay to retain counsel before arraignment, the arraignment works differently.    For counseled defendants, the Magistrate Defendants invite counsel to comment on bail, and counsel will sometimes raise their client's lack of financial resources as a basis for reducing or eliminating secured cash bail conditions.    Thus, ironically, it is *only* detainees with the resources to retain an attorney in the first place who are afforded an opportunity to

---

[5] Board of Governors of the Federal Reserve System, *Report on the Economic Well-Being of U.S. Households in 2017*, May 2018, available at https://www.federalreserve.gov/publications/files/2017-report-economic-well-being-us-households-201805.pdf.

[6] *See, e.g.*, Ex. A, David Arnold, Will Dobbie, & Cynthia Yang, *Racial Bias in Bail Decisions*, 133 Quarterly Journal of Economics 1885 (2018), *available at* https://www.princeton.edu/~wdobbie/files/racialbias.pdf; *see also* Cynthia Jones & Nancy Gist, *Decision Points: Disproportionate Pretrial Detention of Blacks and Latinos Drives Mass Incarceration*, Huffington Post (Nov. 11, 2016) (summarizing and multiple studies and data sources), *available at* https://www.huffpost.com/entry/pretrial-detention-blacks-and-latinos_b_8537602?utm_hp_ref=criminal-justice.

have their indigency considered as a bail factor at the arraignment.  Despite the fact that the Magistrate Defendants are aware that inability to pay is regularly raised *even by detainees who can afford counsel*, these Defendants continue their policy and practice of not inquiring into the ability of *unrepresented* detainees to satisfy secured cash bail conditions.

83.    The difference counsel makes is well illustrated by an arraignment that occurred on April 3, 2019, in which the arrestee was initially arraigned before Magistrate Echartea without counsel, resulting in a $15,000/10% bond.  Shortly after the arraignment, a lawyer who was retained by the arrestee's family arrived on the arrestee's behalf—a rarity in the 36th District Court.  The attorney was permitted to argue bond, and bond was reduced to $10,000/10%.  Having a lawyer matters.

84.    In fact, on some occasions, the Magistrate Defendants may even treat the presence of retained counsel as a factor in favor of reducing cash bail.  For example, on March 1, 2019, Chief Magistrate Wood suggested to a counseled arrestee that the presence of retained counsel was a factor in favor of reduced cash bail because "the Court believes [the arrestee] is taking this case seriously because he's retained counsel."

### iv. After Arraignment, Arrestees Who Cannot Pay Their Bail Conditions Are Detained in Wayne County Jails.

85.     Shortly after an arrestee is arraigned by video at the DDC, the arrestee is transferred to the custody of the Wayne County Sheriff's office and is transported to one of the three jails operated by the Sheriff ("the Wayne County Jails").

86.     If an arrestee posts bail, the arrestee is usually released within 24 hours, sometimes significantly faster.  Otherwise, she remains in one of the Wayne County Jails until either she pays to be released or the criminal proceedings against her are completed or dismissed.

87.     The Wayne County Jails collectively house between 1,600 to 1,700 individuals every night.[7]  Approximately 62% of detainees in the Wayne County Jails are pre-trial detainees,[8] and around half of the pretrial detainees in the jails are held on charges exclusively originating in the 36th District Court.  Most pretrial detainees, do not remain detained voluntarily but rather because they cannot afford to purchase their pre-trial freedom.

---

[7] Hasan Dudar, *Wayne County jail finally gets a new home in Detroit*, Detroit Free Press (March 7, 2018) (providing statistics from Sheriff Napoleon), *available at*, https://www.freep.com/story/news/local/michigan/wayne/2018/03/07/wayne-county-jail-detroit-michigan/402364002/

[8] Vera Institute of Justice, *Wayne County, MI Incarceration Trends*, data recent as of 2015, *available at* http://trends.vera.org/rates/wayne-county-mi?incarceration=count&incarcerationData=all

88.     It costs approximately $165 *per night* to detain a person in the Wayne

County Jails.[9]  Thus, taxpayers are paying hundreds of thousands of dollars *every*

*night* to house pre-trial detainees in the Wayne County Jails.

89.     Meanwhile, Wayne County has announced plans to build a new $533

million detention center that will increase the total number of jail beds in Wayne

County, even though the current capacity is far in excess of what would be needed

to detain the population that has actually been *convicted* of crimes in Detroit.

> **v. The Magistrate Defendants Have the Legal Authority to Release Arrestees on Their Own Recognizance or Under Non-Financial Bail Conditions But Fail to Do So.**

90.     Under the Michigan Constitution, all arrestees are entitled to bail by

"sufficient sureties" except in four specific circumstances.  The exceptions arise

only when the proof of guilt is "evident or the presumption great" *and* when the

person is charged with one of four categories of crimes:  (1) murder or treason; (2)

violent felonies that were allegedly committed while the accused was on probation,

parole, or another form of release; (3) violent felonies in which the accused has

already been convicted of two or more other violent felonies arising out of separate

incidents in the past fifteen years; or (4) criminal sexual conduct in the first degree,

---

[9] Eric Lawrence, *Wayne County Could Start Sending Inmates to Other Jails*, Detroit Free Press (July 29, 2015), *available at* https://www.freep.com/story/news/local/michigan/wayne/2015/07/29/wayne-county-inmates-jails/30859899/.

armed robbery, or kidnapping with an intent to extort.[10]  Mich. Const. of 1963, art.

I, § 15; *see also* Mich. Ct. R.  6.106(B)(1).

91.    For all other charges, Michigan Court Rule 6.106(C) requires that the

arrestee be released on her own recognizance, or on an unsecured appearance bond,

*unless* the court specifically determines that unsecured release on personal

recognizance will not reasonably ensure the arrestee's appearance at future

hearings or will present a danger to the public.

92.    Even when an arrestee is not eligible for release on her own

recognizance, Michigan Court Rules 6.106(D)–(E) require that the court next

consider imposing *non-financial* release conditions.    These non-financial

conditions may include requiring the arrestee to:  (a) make reports to a court

agency as are specified by the court or the agency; (b) not use alcohol or illicitly

use any controlled substance; (c) participate in a substance abuse testing or

monitoring program; (d) participate in a specified treatment program for any

physical or mental condition, including substance abuse; (e) comply with

restrictions on personal associations, place of residence, place of employment, or

travel; (f) surrender a driver's license or passport; (g) comply with a specified

curfew; (h) continue to seek employment; (i) continue or begin an educational

program; (j) remain in the custody of a responsible member of the community who

---

[10] Arrestees in the fourth category are still entitled to bail if there is clear and convincing evidence that the defendant is not a flight risk or a danger to others.

agrees to monitor the defendant and report any violation of any release condition to the court; (k) not possess a firearm or other dangerous weapon; (l) not enter specified premises or areas and not assault, beat, molest or wound a named person or persons; (m) comply with any condition limiting or prohibiting contact with any other named person or persons.; (n) satisfy any injunctive order made a condition of release; or (o) comply with any other condition that the court determines is reasonably necessary to ensure the arrestee's appearance and the safety of the public.

93.     Michigan Court Rules further provide that a court may impose secured cash bail conditions *only* as a matter of last resort after determining, for reasons stated on the record, that the arrestee's appearance at future hearings or the protection of the public cannot be ensured by the use of the numerous non-financial release conditions that are at the court's disposal.  Mich. Ct. R. 6.106(E).

94.     As a result, people arrested in Michigan for most offenses have a liberty interest under state law in being released pending trial without secured cash bail conditions, absent a specific individualized finding that such conditions are necessary to protect the public or ensure attendance at future hearings.

95.     But under the Arraignment Policies and Practices, the Magistrate Defendants do not make any such findings, on the record or otherwise.  Instead, secured cash bail conditions are routinely and presumptively imposed for most

offenses without any consideration of whether other, non-financial, conditions would suffice to ensure the arrestee's appearance or protect the public. In almost no instance does a Magistrate Defendant ever explain on the record how a cash bail condition serves to further either of these two purposes in anything other than the most generic, boilerplate fashion.

96. A mere 15% of arraigned arrestees are released without a secured cash bail condition of some sort. And even this subset of arrestees are released as the result *only* of the nature of the charges against them and their criminal histories, *not* because the Magistrate Defendants conducted an inquiry into their ability to pay.

97. The policies and practices described above are not simply a matter of flawed individual adjudications, but rather represent an administrative decision and policy by the 36th District Court to conduct arraignments that altogether deny arrestees any hearing at all at which their ability to pay is considered or assessed and weighed against the potential risks posed by their release. There are, to be sure, minor differences between how the five Defendant Magistrates interact with arrestees, but all follow the Arraignment Policies and Practices described above in all but the most exceptional cases.

     **vi. Indigent Detainees Have No Viable Opportunity to Have Their Bail Reduced or Reconsidered for *at Least* One Week, Usually Two, After Arraignment.**

98.   The imposition of secured cash bail conditions at the arraignment is the moment of differential treatment:  an arrestee with financial resources will pay her bail (or pay a bail bondsman) and be released shortly after the arraignment, while otherwise identical arrestees (such as Plaintiffs and those similarly situated) who cannot afford their secured cash bail conditions will be detained for at least an additional week—and likely much longer—as long as their bail remains unpaid.

99.   In the 36th District Court, counsel appointments are not made until after arraignment.  Upon receiving an assignment, there is no viable procedure by which court-appointed counsel can have her client's bail conditions reconsidered prior to the probable cause hearing, at least a week after arraignment.

100.  In fact, many court-appointed attorneys first meet their clients at the probable cause hearing.  In misdemeanor cases, indigent arrestees simply are not assigned counsel until they actually arrive at their pre-trial hearing, and at that hearing they are represented by the "house counsel," i.e., by a defense attorney who is appointed just for the day to temporarily represent all alleged misdemeanants.  In felony cases, arrestees are assigned individual attorneys, but those assignments often are not received until a few days before the probable cause hearing, and defense counsel are not always able to meet with their clients before that hearing.  For example, at least 25% of indigent felony cases in Wayne County are assigned to the Metropolitan Justice Center of Southeast Michigan

36

("MJCSM").   Because of resource constraints and docket pressure, attorneys at MJCSM *never* meet with their clients prior to the probable cause hearing.   And individual assigned counsel are paid for appearing at the probable cause hearing, but are not paid for any motions filed before the hearing.

101.   In the 36th District Court, District Judges preside at the probable cause hearing.   At the hearing, an arrestee's attorney is permitted to make arguments to the judge seeking the modification of bail imposed at arraignment. Prosecutors can, and sometimes do, request that bail be increased.   If the arrestee seeks a reduction of her secured cash bail conditions, the district judge will not immediately act upon the request in the vast majority of cases.   Instead, the district judge will request that the Pre-Trial Services Unit prepare a report for consideration at the *next* hearing, i.e., the preliminary examination that occurs approximately a week later.

102.   As noted above, by court rule, the preliminary examination must be scheduled five to seven days after the probable cause hearing.   Accordingly, in many cases, arrestees will not have an opportunity for a district judge to reconsider the Magistrate Defendants' initial bail determination until over two weeks after their initial arraignment.[11]

---

[11] Although this lawsuit does not seek to directly address any bail hearings that may eventually be conducted by the district judges, such hearings also are often constitutionally suspect.  The Pre-Trial Service Unit is empowered to recommend

**C. Chief Judge Blount Directs and Acquiesces to the Magistrate Defendants' Policies and Practices.**

103.   Chief Judge Blount is responsible for firing, hiring, and supervising the Magistrate Defendants, who are at-will employees.  She is also responsible for issuing declarations stating what types of case work Magistrates in the 36th District Court are authorized to do.  She has a central role in formulating the policies and practices that are followed by the Magistrate Defendants, and she is the official who authorizes them to preside at arraignments.  Chief Judge Blount has served in that capacity since 2014.  She is aware of the manner in which arraignments are conducted and has the authority to instruct the Magistrate Defendants to conduct the arraignments in a different manner such that arrestees' indigency would be properly considered under constitutional standards.

---

reductions of secured cash bail conditions in some cases, but often fails to do so even when the arrestee is clearly unable to afford bail and when there is no clear and convincing individualized evidence that the arrestee presents an unmanageable flight risk or identifiable and articulable danger to the community.  And even when the Pre-Trial Services Unit *does* recommend a reduction or elimination of secured cash bail conditions, district judges often disregard the recommendations and simply rubber stamp the original bail imposed by the Magistrate Defendants. Sometimes, the district judges impose *more* onerous conditions instead.  Nor, in most cases, do district judges give serious consideration to indigency or justify the setting of continued secured cash bail conditions by making evidence-based individualized findings on the record that the arrestee poses an unmanageable flight risk or identifiable and articulable danger to the public.  Thus, many arrestees remain unconstitutionally detained for weeks, months, or longer due to their inability to afford bail.

104.   Conducting arraignments is one of the central job duties of the Magistrate Defendants.

105.   The Michigan Indigent Defense Commission has announced a standard recommending that all jurisdictions in Michigan provide counsel for indigent arrestees at the time of arraignment.   This standard has not been implemented in the 36th District Court.

**D. The Period of Automatic Detention Resulting from Defendants' Policies and Practices Unconstitutionally Discriminates Against Indigent Defendants.**

106.   As the result of the Arraignment Policies and Practices, the Defendant Magistrates routinely send indigent arrestees to jail without providing them with an opportunity for a bail hearing at which their indigency will even be mentioned. This policy causes extraordinary harm for indigent arrestees, and yet is completely ineffective at accomplishing any permissible judicial or governmental purpose, let alone being narrowly tailored to achieve a *compelling* governmental purpose, as required by the Due Process and Equal Protection clauses.

**i. The Arraignment Policies and Practices Inflict Severe Harm on Indigent Arrestees.**

107.   Sitting in jail for more than a week—at a time when a person is still presumed innocent—is an inherently harmful deprivation of liberty.   Beyond the

jail time itself, a person who is detained for even a few days will often face serious collateral consequences that can devastate that person's life for years or decades to come.[12]   At the very least, she is likely to lose income from missing work.  Much worse, after two or three days she is likely to face a serious risk of being fired altogether, a risk that dramatically increases with each additional day of detention. She may miss rent payments and get evicted.[13]   She may suffer setbacks in an educational program or miss important medical appointments.  She may even lose custody of her children because of her inability to arrange for childcare.  Indeed, studies show what may already be obvious, namely that the results of pretrial detention can be quite long-lasting.[14]

---

[12] *See Barker v. Wingo*, 407 U.S. 514, 532-33 (1972) ("The time spent in jail awaiting trial has a detrimental impact on the individual. It often means loss of a job; it disrupts family life; and it enforces idleness. Most jails offer little or no recreational or rehabilitative programs. The time spent in jail is simply dead time. Moreover, if a defendant is locked up, he is hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense. Imposing those consequences on anyone who has not yet been convicted is serious. It is especially unfortunate to impose them on those persons who are ultimately found to be innocent.")

[13] *See* Erika Kates, *Moving Beyond Incarceration for Women in Massachusetts: The Necessity of Bail/Pretrial Reform*, Wellesley Centers for Women, 2, 4-5 (March 2015) (survey of women in pretrial detention demonstrated that almost half were at risk of losing their home).

[14] Ex. B, Will Dobbie, Jacob Goldin, & Crystal S. Yang, *The Effects of Pretrial Detention on Conviction, Future Crime, and Employment: Evidence from Randomly Assigned Judges*, 108 Am. Econ. Rev. 201, 235 (2018) ("We find suggestive evidence that in the first two years after the bail hearing, pre-trial

108.   Largely as a result of the rapid effects of even short periods of pre-trial detention, research shows that suicides are the leading cause of death in local jails, and occur at a rate higher than in state prisons.[15]   Indeed, more than one-third of such suicides occur during the first seven days of detention, a fact attributable to the shock of corresponding job and/or housing loss.[16]

109.   Unaffordable secured cash bail also inflicts harms on arrestees' families.  All of the harms described above have obvious impacts on families.  In addition, the loved ones of individuals who are given unaffordable bail are confronted with the difficult choice of allowing the arrestee to languish in jail or

---

release increases the joint probability of not being arrested and of being employed, although our estimates are not precisely estimated.  Similarly, we find an increase in the joint probability of not being rearrested and being employed in the third to fourth years after the bail hearing.  These results indicate that decreases in future crime may be driven by the same defendants who are employed, suggesting that pre-trial release may decrease future crime through the channel of increased labor market attachment."), *available at* https://pubs.aeaweb.org/doi/pdfplus/10.1257/aer.20161503

[15] Margaret E. Noonan, U.S. Dep't of Justice, Bureau of Justice Statistics, Mortality in Local Jails and State Prisons, 2000-2013 - Statistical Tables 1, 20 (Aug. 2015), *available at* https://www.bjs.gov/content/pub/pdf/mljsp0013st.pdf.

[16] Ex. C, Maurice Chammah & Tom Meagher, *Why Jails Have More Suicides Than Prisons*, Marshall Project (Aug. 4, 2015) ("One reason why jails have a higher suicide rate … than prisons … is that people who enter a jail often face a first-time 'shock of confinement'; they are stripped of their job, housing, and basic sense of normalcy. Many commit suicide before they have been convicted at all."), *available at* https://www.themarshallproject.org/2015/08/04/why-jails-have-more-suicides-than-prisons.

taking out unaffordable debts to cover the secured cash bail conditions—money that will never be returned to the family if it takes the form of fees paid to bail bondspersons. The result for indigent families is increased housing or food instability and other sacrifices that diminish the life chances of arrestees' children, spouses, parents, and other loved ones.[17]

110. For example, Plaintiffs may suffer in numerous ways. Three of seven Plaintiffs (Ms. Jackson, Ms. Gardner, and Ms. Dixon) missed work at brand new jobs and have very likely been fired. Yet another Plaintiff (Mr. Ross) has missed a job interview.

111. Two Plaintiffs, Mr. Ross and Mr. Moore, have missed classes (including examinations in Mr. Moore's case), and will continue to face additional educational setbacks if their detention continues.

112. The Plaintiffs' health is also suffering as a result of their detention. Mr. Lucas has not received the proper timely medication for his epilepsy, hypertension, and asthma. Mr. Ross and Ms. Jackson have experienced significant weight loss, and Mr. Moore has experienced depression.

---

[17] *See* Gina Clayton, Endria Richardson, Lily Mandlin, & Brittany Farr, Ph.D., *Because She's Powerful: The Political Isolation and Resistance of Women with Incarcerated Loved Ones*, Essie Justice Group, *available at* https://www.becausesheispowerful.org/wp-content/uploads/2018/05/Essie-Justice-Group_Because-Shes-Powerful-Report.pdf

113.    Almost all of the Plaintiffs face the prospect of losing their housing if their detention is prolonged, along with the possible loss of their personal items. Mr. Lucas, for example, fears the loss of his photo albums and the obituaries of his mother, siblings, and wife—all of whom are deceased.

114.    Plaintiffs' family members are suffering in their absence too.  Ms. Jackson—a single mother and the sole caregiver to two children—is unable to care for her children and will certainly experience further difficulties if she is released as the result of missing her first day at a new job.  Ms. Dixon is unable to visit her children.  And, of course, all of Plaintiffs' loved ones experience the emotion pain of their absence—at a time when each Plaintiff remains innocent until proven guilty.

115.    Rather than face these consequences resulting from extended delays before a bail hearing, research has shown that many people charged with low-level crimes simply plead guilty rather than spending weeks sitting in jail in order to assert their innocence.[18]

---

[18] Ex. D, Paul Heaton, et al., *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 736, 747 (2016), available at https://review.law.stanford.edu/wp-content/uploads/sites/3/2017/02/69-Stan-L-Rev-711.pdf; Ex. E, Megan Stevenson, *Distortion of Justice: How the Inability to Pay Bail Affects Case Outcomes*, 34 Journal of Law, Economics & Organization, 511, 512, 532 (2018) (finding that a person who is detained pretrial has a 13 percent increase in the likelihood of being convicted and an 18 percent increase in the likelihood of pleading guilty), available at https://academic.oup.com/jleo/article/34/4/511/5100740; Emily Leslie & Nolan G. Pope, *The Unintended*

116.   To make matters worse, studies also show that individuals detained pretrial are, on average, given 42% longer jail sentences.  In misdemeanor cases this can happen for the simple reason that the time already served before negotiating a plea bargain exceeds the sentence that is meted out to similar defendants who were released and later plead guilty.[19]   Indeed, controlling for other factors, pretrial detention is the single greatest predictor of a conviction and a sentence to jail or prison time.[20]

117.   Conducting a proper bail hearing before detaining an arrestee, and appointing defense counsel for the bail hearing, are necessary to avoid this prejudice and to protect the fairness of criminal proceedings in the 36th District Court. Appointment of a defense attorney more than doubles the chance that a judge will release the accused on her own recognizance.  In cases where judges do

---

*Impact of Pretrial Detention on Case Outcomes: Evidence from New York City Arraignment*, 60 J.L. & Econ. 529 (2017).

[19] Ex. E, Stevenson, *supra* note 17, at 513, 534–36; Ex. D, Heaton, et al., *supra* note 17, at 717.

[20] *See* Christopher T. Lowenkamp, Marie VanNostrand & Alexander Holsinger, *Investigating the Impact of Pretrial Detention on Sentencing Outcomes*, Laura & John Arnold Foundation, at pp. 10–11 (Nov. 2013) (finding that people detained until case disposition are 4.44 times more likely to be sentenced to jail and 3.32 times more likely to be sentenced to prison), *available at* https://craftmediabucket.s3.amazonaws.com/uploads/PDFs/LJAF_Report_state-sentencing_FNL.pdf; Mary T. Philips, New York City Crim. Justice Agency, Inc., *Pretrial Detention and Case Outcomes, Part 1: Nonfelony* Cases, at pp. 25–29 (2007) (finding conviction rate jumps from 50% for people released immediately pretrial, to 92% for people detained until case disposition).

choose to order bail, appointment of a defense attorney can more than double the chance that the judge would lower the bail set to an affordable amount.[21]

118.   As discussed above, indigent arrestees in the 36th District Court have no chance to have their indigency considered in connection with bail until their probable cause hearing, which occurs at least a week after the arraignment.  At that hearing, they often meet their attorneys for the first time, and the attorneys may lack helpful facts and evidence to argue persuasively for the elimination of any cash bail considerations.   Even when the attorney is prepared to make such arguments, it is not uncommon for district judges to postpone a decision on reducing bail until the *next* hearing (the preliminary examination), another five to seven days later.   By contrast, a low-level arrestee who pleads guilty at the probable cause hearing in return for a time-served sentence can obtain immediate release.  This effectively coerces some detainees to plead guilty, particularly those who face some of the harms discussed above, such as eviction, job loss, and loss of child custody.

      **ii.  The Arraignment Policies and Practices Do Not Further Any Valid Judicial or Governmental Goal, Let Alone a Compelling One.**

119.  Empirical evidence shows that there is no relationship between requiring money bail as a condition of release and defendants' rates of appearance

---

[21] Douglas L. Colbert *et al.*, *Do Attorneys Really Matter? The Empirical and Legal Case for the Right of Counsel at Bail*, 23 Cardozo L. Rev. 1719, 1720 (2002).

in court.[22]   This finding has been affirmed by extensive fact-finding in multiple

federal courts.[23]

120.   As for public safety, secured bail is demonstrably *harmful*.  Requiring

people to pay for their release means that people with low incomes spend more

time in jail.  After brief periods of detention, each additional day a person spends

locked in jail increases the likelihood that she will be rearrested after she is

released, largely as a result of the economic harms she will have suffered as a

result of her detention.[24]

---

[22] *See, e.g.*, Arpit Gupta, Christopher Hansman, & Ethan Frenchman, *The Heavy Costs of High Bail: Evidence from Judge Randomization*, 45 Journal of Legal Studies 471, 475 (2016) at 5, available at http://www.columbia.edu/~cjh2182/ GuptaHansmanFrenchman.pdf ("[W]e find no evidence that money bail increases the probability of appearance."); Ex. F, Michael R. Jones, *Unsecured Bonds: The As Effective and Most Efficient Pretrial Release Option*, Pre-Trial Justice Institute Report at 11 (October 2013), *available at* https://pdfs.semanticscholar.org/5444/ 7711f036e000af0f177e176584b7aa7532f7.pdf.

[23] *See, e.g.*, *ODonnell v. Harris Cnty.*, 882 F.3d 528, 545 (5th Cir. 2018) (upholding the district court's "thorough review of empirical data and studies [finding] that the County had failed to establish any 'link between financial conditions of release and appearance at trial or law-abiding behavior before trial'"); *Schultz v. Alabama*, 330 F. Supp. 3d 1344, 1362 (N.D. Ala. 2018) ("[Plaintiff] offered expert testimony and empirical studies to demonstrate that secured money bail is not more effective than unsecured bail or non-monetary conditions of release in reducing the risk of flight from prosecution.").

[24] *See* Ex. D, Heaton, *supra* note 17, at 762 ("[B]y one month after the hearing the average number of new charges for detainees has exceeded that of their similarly situated counterparts who were released. To the extent that the rich set of controls allows one to construe these differences as causal, they suggest that pretrial detention has a greater criminogenic than deterrent effect."); Christopher T. Lowenkamp, Marie VanNostrand & Alexander Holsinger, *The Hidden Costs of*

121.   The use of secured bail also tends to have a severely disparate impact on Black and Latino arrestees.  African-Americans are five times more likely to be detained in the first place than their white counterparts, and three times more likely to be detained than their Latino counterparts.[25]   In turn, African-Americans and Latinos are more likely than whites to be held in continued detention because they cannot afford their bail.[26] As stated above, people who cannot afford to pay for their release—disproportionately African-Americans and Latinos—are significantly more likely to abandon valid defenses and plead guilty just to get out of jail and they are more likely to receive longer jail sentences.

122.   In the Wayne County Jails, approximately 90% of the individuals being held pre-trial on charges exclusively originating from the 36th District Court identified as African-American or Black.

---

*Pretrial Detention*, Laura & John Arnold Foundation, at 19–20 (November 2013) ("Defendants detained pretrial were 1.3 times more likely to recidivate compared to defendants who were released at some point pending trial."), *available at* https://craftmediabucket.s3.amazonaws.com/uploads/PDFs/LJAF_Report_hidden-costs_FNL.pdf.

[25] *See, e.g.*, *Bail Fail: Why the U.S. Should End the Practice of Using Money for Bail*, Justice Policy Inst. 15 (2012), *available at* http://www.justicepolicy.org/uploads/justicepolicy/documents/bailfail.pdf.

[26] *See* Stephen Demuth, *Racial and Ethnic Differences in Pretrial Release Decisions and Outcomes: A Comparison of Hispanic, Black and White Felony Arrestees*, 41 Criminology 873, 889–90, 899 (2003).

123.   The 36th District Court has other, more effective and less harmful, options for administering its arraignments and bail conditions. Recognizing the limitations and dangers of secured bail, other jurisdictions rely on alternative measures to ensure that people show up for court.  The simplest of these measures is a personal bond, which means a person is released in exchange for her promise to pay money only if she actually fails to appear in court.  A personal bond is equally effective at securing court appearances as secured bail.[27]

124.   In fact, personal bonds are an option easily available to the Defendant Magistrates.  As described above, Michigan's court rules provide that personal bond is to be the rule, not the exception, for most offenses absent individualized evidence justifying an alternate approach.  Yet in the 36th District Court, secured cash bail conditions imposed with no inquiry into an arrestee's indigency are common, and even when personal bonds are granted they are not granted as a result of an inquiry into the arrestee's ability or inability to afford secured cash bail conditions.

125.   Other less discriminatory yet equally effective alternatives range from simple, low-cost interventions to help people appear in court, such as reminders of

---

[27] *See, e.g.*, *ODonnell*, 882 F.3d at 545; *see also* Gupta, *supra* note 21, at 21; Ex. F, Jones, *supra* note 21, at 11 ("Whether released defendants are higher or lower risk or in-between, unsecured bonds offer the same likelihood of court appearance as do secured bonds.").

court dates and transportation to court,[28] to more intensive supervision, such as required reporting, curfews, maintaining existing employment or, in what should be unusual circumstances, electronic monitoring at no expense to the indigent arrestee.[29]   The key to effective implementation of these alternatives is to tailor conditions of release or detention according to the needs and abilities of each individual.

126.   This approach works.   For example, Washington, D.C. has relied heavily on alternatives to cash bail for more than twenty years.   The District of Columbia enjoys a reappearance rate of 90%, with no rearrest for violent crime for over 98% of people.[30]   The cost of release is approximately $18 per person per day,

[28] *E.g.*, Ex. G, Brice Cooke *et al.*, *Using Behavioral Science to Improve Criminal Justice Outcomes: Preventing Failures to Appear in Court*, University of Chicago Crime Lab, at 15–18 (Jan. 2018), *available at* https://urbanlabs.uchicago.edu/attachments/store/9c86b123e3b00a5da58318f438a6e787dd01d66d0efad54d66aa232a6473/I42-954_NYCSummonsPaper_Final_Mar2018.pdf.

[29] *E.g.*, Christopher Lowenkamp & Marie VanNostrand, *Exploring the Impact of Supervision on Pretrial Outcomes*, Laura and John Arnold Foundation, at 17 (Nov. 2013), *available at* https://craftmediabucket.s3.amazonaws.com/uploads/PDFs/LJAF_Report_Supervision_FNL.pdf.

[30] Washington D.C. Pre-Trial Services Performance Measures for FY 2011–15, *archived at* *https://perma.cc/AT9Y-V4EL*; *see also* Tim Schnacke, *Fundamentals of Bail: A Resources Guide for Pretrial Practitioners and a Framework for American Pretrial Reform*, U.S. Dep't of Justice, Nat'l Inst. of Corrections (2014) (discussing Washington, D.C.'s experience), available at http://www.clebp.org/images/2014-11-05_final_bail_fundamentals_september_8,_2014.pdf.

49

compared with the cost of approximately $165 per person per day to lock someone in a Wayne County Jail.

127.   In fact, setting secured cash bail conditions that are unaffordable defeats the very purpose of secured cash bail conditions—to incentivize a person to return to court.  If bail is set high enough that the arrestee cannot afford to pay, the arrestee remains in jail instead of leaving jail with some financial incentive to return.  This fact removes any legitimate (let alone compelling) state interest in the setting of a financial condition.  Unaffordable cash bail may be a backdoor way of indefinitely detaining an individual without quite saying so, but it does nothing to promote its supposed purpose of allowing the individual to be released with an incentive to return to court.  In any event the Arraignment Policies and Practices do not keep *all* arrestees out of the community pre-trial; they keep only *poor* arrestees who cannot afford bail out of the community while those who can afford to buy their freedom are able to leave jail, avoid collateral consequences of their arrest, and actively participate in their defense.

**E. The 36th District Court's Arraignment Policies and Practices Deprive People of Liberty Without Adequate Procedural Protections and Without Constitutionally Required Findings.**

128.   The Arraignment Policies and Practices also violate procedural due process by depriving people of their liberty without adequate procedural protections.

129.    As described above, bail is initially set by the Magistrate Defendants at arraignment.   Yet, by their design, the Arraignment Policies and Practices deprive arrestees of notice of the basis upon which bail is being determined and notice that their ability to pay is, or at least should be, relevant.   Because indigent arrestees also do not have counsel at arraignment, counsel cannot provide the notice that the Magistrate Defendants fail to provide.

130.    Thus, instead of holding a bail *hearing*, Magistrate Defendants simply impose secured cash bail conditions via a cursory and summary procedure that lacks any of the hallmark protections that are required before a person can constitutionally be deprived of her liberty prior to trial: a counseled hearing where the person can present and rebut evidence concerning flight risk or danger to the community; advance notice of the hearing; and individualized, reasoned findings, by clear and convincing evidence, that no other non-financial release conditions could address any risk of flight or danger to the community.

131.    The 36th District Court could provide a constitutionally adequate pretrial detention proceeding at arraignment that would be consistent with Michigan law. Instead, it continues to operate a pretrial detention system based on wealth.

## CLASS ACTION ALLEGATIONS

132.    The named Plaintiffs seek injunctive and declaratory relief, on behalf

of themselves and all others similarly situated, under Rules 23(a),23(b)(2), and 23(c)(4) of the Federal Rules of Civil Procedure.  Plaintiffs seek to represent the class composed of all pre-trial detainees whose bail is set at arraignments in the 36th District Court and who, as a result of the policies and practices followed by Defendants when setting bail, face detention because they are unable to pay imposed secured cash bail conditions.

133.   This action satisfies the numerosity, commonality, typicality, and adequacy requirements of those provisions.

### A.   Numerosity, Fed. R. Civ. P. 23(a)(1)

134.   According to the 36th District Court's website, it is "the largest district court in the State of Michigan and one of the busiest courts in the United States."  In turn, the Wayne County jail system is the largest and busiest county jail system in the state, with the capacity to incarcerate over 2,900 people and with an average daily population of 1,600 to 1,700 detained individuals.  Approximately 62% of the detained people in the Wayne County Jail are pre-trial arrestees.  The vast majority of arrestees who fail to post bond do so because they cannot afford to meet the secured cash bail conditions imposed under the Arraignment Policies and Practices.  As a result, the number of current and future arrestees subject to Arraignment Policies and Practices easily numbers in the thousands.

135.   The population of people detained pretrial is constantly changing.

Dozens of people are arraigned in the 36th District Court nearly every day, and a significant proportion are detained after failing to satisfy secured cash bail conditions imposed at the arraignment.    In turn, arrestees exit the class at unpredictable intervals as their cases are resolved through plea bargains, dismissals, and trial.   Or, if they are eventually bailed out despite their indigency, this often occurs only because the arrestee has taken on unaffordable debt in order to secure her release or because of the fortuitous intervention of a charitable third-party.

136.   Joinder is impracticable because the class is both too numerous and too fluid for the Court to feasibly hear their independent claims.

137.   Joinder is also impracticable because the members of the class are, by definition, too poor to hire lawyers to bring independent claims.

**B.     Commonality, Fed. R. Civ. P. 23(a)(2)**

138.   The relief sought is common to all members of the Class, and common questions of law and fact exist as to all members of the Class.   The named Plaintiffs seek a declaratory judgment that the 36th District Court's Arraignment Policies and Procedures are unconstitutional, and an order enjoining them, on grounds that they violate the Due Process and Equal Protection Clauses of the Fourteenth Amendment and the Sixth Amendment right to counsel.   They also seek an injunction prohibiting the Sheriff from detaining arrestees after the arraignment

absent assurances that an actual bail hearing has occurred at which indigency and ability to pay are properly considered.  These claims and remedies are common to the entire class and would apply equally to all class members.  Furthermore, the Arraignment Policies and Practices apply openly and in materially the same manner every day with respect to all people arraigned at the 36th District Court. Resolution of the legal and factual issues raised by this Complaint will determine whether all the members of the class are entitled to the constitutional relief that they seek.

139.   Among the most important common questions of fact are:

- Whether the Magistrate Defendants have a widespread, well-settled policy and practice of setting secured cash bail conditions without inquiring into ability to pay and without considering alternative less restrictive bail conditions;

- Whether Magistrate Defendants have a widespread, well-settled policy and practice of setting unaffordable secured bail for indigent arrestees without adequate procedural protections, including notice, an opportunity to present and contest evidence, appointment of counsel, and reasoned findings based on clear and convincing individualized evidence on the record that there are no less restrictive means of mitigating any unmanageable flight risk or identifiable and articulable danger to the community;

- Whether Magistrate Defendants are deliberately blind to evidence of indigency, in the form of arrestees' requests for appointed counsel, and when and how such information is made available to the 36th District Court;

- Whether the Arraignment Policies and Practices are known to, approved of, and/or ordered by Defendant Blount;

- Whether the secured cash bail conditions imposed by Magistrate Defendants at arraignments result in pretrial detention, and the length of such pretrial detention;

- Whether unaffordable secured cash bail conditions undermine the fairness of plea bargaining and coerce guilty pleas; and

  How long class members must wait in jail after arrest before they have a meaningful opportunity to raise their inability to pay for their release or to request alternative, non-financial conditions.

140.   Among the most important common questions of law are:

- Whether imposing unaffordable secured cash bail without providing a hearing at which the arrestee may have her inability to pay properly considered violates Substantive Due Process and Equal Protection principles guaranteed by the Fourteenth Amendment by discriminatorily depriving indigent arrestees of their liberty while wealthier arrestees are able to secure their pretrial freedom;

- Whether the Arraignment Policies and Practices violate the Procedural Due Process guarantees of the Fourteenth Amendment by depriving the class members of their pre-trial liberty without adequate procedural protections including notice, an opportunity to present and contest evidence, appointment of counsel, and reasoned individualized findings on the record that unaffordable secured bail is the least restrictive means of mitigating any risk of flight of danger to the community; and

- Whether the Arraignment Policies and Practices violate arrestees' Sixth Amendment right to counsel.

**C.    Typicality, Fed. R. Civ. P. 23(a)(3)**

141.   The named Plaintiffs' claims are typical of the claims of the other members of the class.  Each class members suffers, or will suffer, the same injury because Defendants fail to comply with basic constitutional requirements.

Namely, all class members are confined in jail (or will be) because they cannot afford to pay secured cash bail conditions that they had no opportunity to contest because they were denied a hearing at which indigency could be considered. The answer to whether the Arraignment Bail Policy and Practices are constitutional will determine the claims of the named Plaintiffs as well as every other class member.

142. If the named Plaintiffs succeed in the claim that the Arraignment Policies and Practices violate their constitutional rights, that ruling will likewise benefit every other member of the class.

### D. Adequacy, Fed. R. Civ. P. 23(a)(4)

143. The named Plaintiffs are adequate representatives of the Class because their interests in the vindication of their legal claims is entirely aligned with the interests of the other class members, each of whom has the same basic constitutional claims. The named Plaintiffs are members of the class, and their interests do not conflict with those of the other class members.

144. There are no known conflicts of interest among members of the proposed class. All of the respective class members have a similar interest in vindicating their constitutional rights by receiving a hearing in which their indigency is properly considered pursuant to constitutional standards and with an attorney present.

145. Plaintiffs are represented by attorneys from the American Civil

Liberties Union Foundation, the American Civil Liberties Union Fund of Michigan, Covington & Burling LLP.[31]   Counsel have extensive combined experience litigating class actions and complex civil rights matters in federal court and extensive knowledge of both the details of the 36th District Court's Arraignment Policies and Procedures and the relevant constitutional and statutory law.   Counsel include litigators who have specific experience with this type of claim, having litigated similar issues in class action lawsuits in other fora around the country.   Counsels' relevant qualifications were set forth in the pending Motion for Class Certification filed concurrently with the original complaint.

146.    Counsel have a detailed understanding of state law and practices as they relate to federal constitutional requirements.   Counsel have studied the way that these systems function in other jurisdictions around the country in order to investigate the wide array of lawful options in practice in other municipalities.

147.    Counsel have devoted significant time and resources to becoming familiar with the 36th District Court's and Wayne County Jails' pretrial detention practices and with the relevant state and federal laws and procedures that can and should govern them.   The interests of the members of the class will be fairly and adequately protected by the Plaintiffs and their attorneys.

---

[31] Since the filing of the original complaint in this matter, two of the undersigned counsel, Twyla Carter and Amia Trigg, have moved to employers, but both continue to represent Plaintiffs in their positions at The Bail Project and NAACP Legal Defense Fund, respectively.

### E. Injunctive and Declaratory Relief Are Appropriate, Fed. R. Civ. P. 23(b)(2)

148.   Class-action status under Rule 23(b)(2) is appropriate because the Defendants, through the Arraignment Policies and Practices, have acted in the same unconstitutional manner with respect to all class members.

149.   Plaintiffs seek declaratory and injunctive relief prohibiting Defendants from continuing to administer their Arraignment Policies and Practices.  The relief sought is appropriate for the class as a whole.

### CLAIMS FOR RELIEF

### COUNT ONE
### 42 U.S.C. § 1983
### Violation of the Equal Protection and Due Process Clauses:
### Wealth-Based Discriminatory Detention

150.   Plaintiffs incorporate all of the allegations above.

151.   Under the Arraignment Policies and Practices, Defendants cause Plaintiffs to be locked in jail because they are unable to pay secured cash bail conditions, while releasing otherwise similarly-situated people who are able to pay. The 36th District Court's wealth-based system of imprisonment locks poorer—but still presumptively innocent—people in jail while allowing wealthier individuals accused of the same crimes and with similar criminal backgrounds to go free until trial.

152.   Defendants routinely set these unaffordable secured bail amounts without any individualized inquiry into or findings concerning: (1) the arrestee's ability to pay; (2) whether clear and convincing evidence demonstrates that the arrestee presents an unmanageable flight risk or identifiable and articulable danger to the community; and (3) whether other less restrictive, non-financial conditions could instead suffice to address any concerns regarding protection of the public or flight risk.

153.   The 36th District Court's wealth-based Arraignment Policies and Practices violate Plaintiffs' rights to Equal Protection and Due Process under the Fourteenth Amendment to the United States Constitution.

**COUNT TWO**
**42 U.S.C. § 1983**
**Violation of Substantive Due Process:**
**Unjustified Pre-Trial Detention**

154.   Plaintiffs incorporate all of the allegations above.

155.   Under the Arraignment Policies and Practices, the Magistrate Defendants set unaffordable secured bail that functionally deprives Plaintiffs of their pre-trial liberty via uncounseled summary arraignments that involve no opportunity for Plaintiffs to introduce evidence or address proper bail conditions.

156.   These unaffordable bail amounts function as de facto pretrial detention orders.   Defendants set these unaffordable bail amounts without providing advance notice of the rights at stake, appointment of defense counsel, the

59

opportunity to present or contest evidence, or a written record of reasoned findings by clear and convincing evidence that secured bail in the amount set is the least restrictive means of achieving a valid and compelling government interest.  Nor do Defendants make any formal determination—let alone an individualized written determination by clear and convincing evidence—that the individual poses an unmanageable flight risk or a specific and articulable threat to the community.

157.   This practice fails to adequately justify the pre-trial deprivation of liberty of an arrested person, thus violating the right to substantive due process guaranteed by the Fourteenth Amendment to the United States Constitution.

**COUNT THREE**
**42 U.S.C. § 1983**
**Violation of Procedural Due Process:**
**Failure to Provide Adequate Hearings Before Depriving Plaintiffs of a**
**Guaranteed Liberty Interest**

158.  Plaintiffs incorporate all of the allegations above.

159. Under  the  Arraignment  Policies  and  Practices,  the  Magistrate Defendants do not make any individualized findings that an arrestee presents an unmanageable flight risk or an identifiable and articulable danger to others if she is released,  nor  do  they  make  any  individualized  findings  that  non-financial  bail conditions will not suffice to address any such risks.

160. The Michigan Constitution guarantees a right to bail by "sufficient sureties" to all arrestees, with the very limited exception of four enumerated groups

of the criminally accused who may be detained without bail if "the proof is evident or the presumption great."   The Michigan Court Rules further create a state-conferred expectation of release without secured cash bail unless a court has made a specific individualized finding on the record that an arrestee's appearance or the protection of the public cannot otherwise be assured.   The Arraignment Policies and Procedures, by contrast, result in unaffordable cash bail being presumptively imposed and without the requisite findings being made.   Nor are any other procedural protections provided to ensure that arrestees' liberty interests are not erroneously extinguished.

161. These procedures deprive arrestees of a state-guaranteed liberty interest without sufficient procedural protections and without any adequate countervailing government interest.   Therefore, the Arraignment Policies and Practices violate the Plaintiffs' right to procedural due process guaranteed by the Fourteenth Amendment to the United States Constitution.

**COUNT FOUR**
**42 U.S.C. § 1983**
**Violation of Sixth Amendment Right to Counsel:**
**Failure to Provide Counsel at a Critical Stage**

162. Plaintiffs incorporate all of the allegations above.

163. Under the Arraignment Policies and Practices, Defendants set unaffordable bail at the arraignments without defense counsel present.   Defendants then lock Plaintiffs in jail because Plaintiffs are unable to pay their bail.   This

initial detention cannot feasibly be challenged by an indigent person with the assistance of counsel until *at least* one week, and usually two weeks, have passed.

164.   The Sixth Amendment to the United States Constitution, incorporated against the States by the Fourteenth Amendment, guarantees criminal defendants the right to counsel at each critical stage of the criminal process.  Critical stages include all pretrial hearings that may prejudice the fairness of subsequent criminal proceedings, including the decision to plea bargain.

165.   The setting of bail has the power to severely prejudice the fairness of subsequent criminal proceedings.  Unaffordable bail can settle the fate of the person accused and render subsequent proceedings a mere formality by inducing plea bargains.  In addition, *proper* determination of bail can require addressing substantive allegations against the arrestee and the strength of the case against the arrestee—issues that can prejudice subsequent proceedings if addressed without counsel.  Bail setting in the 36th District Court is therefore a critical stage of prosecution, and the Sixth Amendment requires that arrestees have the benefit of counsel when bail is set.  By setting Plaintiffs' bail without first appointing defense counsel to represent and assist them, the Arraignment Policies and Practices violate the right to counsel guaranteed by the Sixth Amendment to the United States Constitution.

# RELIEF REQUESTED

Plaintiffs request that this Court issue the following relief on behalf of themselves and all members of the proposed class:

1. An order certifying the class defined above;

2. An order entering judgment in favor of Plaintiffs and against Defendants;

3. A declaratory judgment that the Arraignment Policies and Procedures violate Plaintiffs' rights to equal protection, substantive and procedural due process, and counsel as set forth above;

4. A permanent injunction prohibiting the Magistrate Defendants and Chief Judge Blount from maintaining the Arraignment Policies and Practices described above, and from failing to provide a prompt bail hearing with constitutionally adequate findings and procedures, at which the indigence of arrestees is considered and properly accounted for, and arrestees are not unjustifiably detained due to their inability to afford cash bail.  Such hearings must occur promptly after arrest and include:

   a. Advance written notice to the arrestee of the factors to be considered in setting bail, and in particular notice that evidence of indigency is relevant to the setting of secured cash bail conditions;

   b. A meaningful, individualized inquiry into ability to pay;

   c. Appointment and presence of counsel for the hearing for any arrestee who cannot afford to retain counsel;

    d.      If the court is considering setting unaffordable bail as the result of evidence that the arrestee presents an unmanageable flight risk or an identifiable and articulable danger to the community, the arrestee must have notice of the evidence in question and an opportunity to testify, present her own evidence, and rebut the evidence against her;

    e.      Reasoned written findings, on the record, of the arrestee's ability to pay; and

    f.      If unaffordable secured cash bail is to be imposed, reasoned written findings must be made, on the record and by clear and convincing evidence, that detention is necessary because there is no other less restrictive means (or combination of means) of mitigating the arrestee's unmanageable risk of flight or an identifiable and articulable danger to an individual or the community.

5.     A permanent injunction prohibiting the Sheriff and his employees and agents from taking custody over and/or continuing to detain any indigent arrestee after arraignment unless there has been a constitutionally adequate inquiry, as described above, into the arrestee's ability to satisfy any secured cash bail conditions;

6.     An order granting reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

7.     Any other relief this Court deems just and proper.

In addition, Plaintiffs each request individual damages on behalf of themselves only, reflecting the financial and emotional harm that Plaintiffs allege has resulted from their pre-trial incarceration, including but not limited to loss of employment and wages, resulting housing insecurity, and other impacts of their incarceration.

                 Respectfully Submitted,

/s/Philip Mayor
Philip Mayor (P81691)
Daniel S. Korobkin (P72842)
American Civil Liberties Union Fund
   of Michigan
2966 Woodward Ave.
Detroit, MI 48201
(313) 578-6803
pmayor@aclumich.org
dkorobkin@aclumich.org


/s/Brandon Buskey
Brandon J. Buskey*
American Civil Liberties Union
   Foundation, Criminal Law Reform
   Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2500
bbuskey@aclu.org

/s/Amia L. Trigg
Amia L. Trigg
NAACP Legal Defense and
   Educational Fund, Inc.
700 14th Street, Suite 600
Washington, D.C. 20005-3202
(202) 682-1300
atrigg@naacpldf.org

/s/ Aaron Lewis
Aaron Lewis (P68688)
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
(424) 332-4800
alewis@cov.com

Marta Cook*
Laura Beth Cohen (P83111)*
Covington & Burling LLP
One CityCenter
850 Tenth Street NW
Washington, DC 20001-4656
(202) 662-6000
mcook@cov.com
lcohen@cov.com

/s/ Twyla J. Carter
Twyla J. Carter
The Bail Project
PO Box 750
Venice, CA 90294
(323) 505-9293
twylac@bailproject.org

Attorneys for Plaintiffs

*Cosigning pursuant to L.R. 83.20(i)(1)(D)(i).

Dated: July 11, 2022